**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MICHAEL RUBIN, On Behalf of Himself
and All Others Similarly Situated,

           Plaintiff,

    v.

INNOCOLL HOLDINGS PUBLIC LIMITED
COMPANY, ANTHONY P. ZOOK,
JONATHAN SYMONDS, SHUMEET
BANERJI, DAVID R. BRENNAN, A.
JAMES CULVERWELL, ROLF D.
SCHMIDT, and JOSEPH WILEY,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

JURY TRIAL DEMANDED

CLASS ACTION

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Michael Rubin ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    This is a class action brought on behalf of the public stockholders of Innocoll Holdings Public Limited Company ("Innocoll" or the "Company") against Innocoll and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Innocoll will be acquired by

Gurnet Point L.P., acting through its general partner Waypoint International GP LLC (together, "Gurnet Point"), through its wholly-owned subsidiary Lough Ree Technologies Limited ("Gurnet Bidco") (the "Proposed Transaction").

2.      On April 4, 2017, Innocoll and Gurnet Point issued a joint press release announcing that they had entered into a Transaction Agreement (the "Merger Agreement") to sell Innocoll to Gurnet Point.  Under the terms of the Merger Agreement, Gurnet Point will acquire all outstanding shares of Innocoll for (a) $1.75 in cash (the "Cash Consideration"), and (b) a contingent value right ("CVR"), that represents the contractual right to receive payments up to a maximum aggregate amount of $4.90 in cash upon, and subject to, the occurrence of certain CVR payment events, for a total potential value of up to $6.65 per Innocoll share.  The Proposed Transaction has been valued up to approximately $209 million.

3.      On April 21, 2017, Innocoll filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the SEC in connection with the Proposed Transaction.  The Proxy, which recommends that Innocoll stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Innocoll management's projections, (ii) Innocoll insiders' potential conflicts of interest; (iii) the valuation analyses prepared by Piper Jaffray & Co. ("Piper") in connection with the rendering of its fairness opinion; (iv) Piper's potential conflicts of interest; and (v) the sale process leading up to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Innocoll stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

4.      In short, unless remedied, Innocoll's public stockholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information

concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Innocoll's United States headquarters are located in this district at 3803 West Chester Pike, Newton Square, Pennsylvania 19073.

## PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Innocoll.

9.     Defendant Innocoll is an Ireland public limited company with its principal executive offices located at Unit 9, Block D, Monksland Business Park, Monksland, Athlone, Ireland and its U.S. headquarters located in Newtown Square, Pennsylvania.  The Company is a global, commercial stage specialty pharmaceutical and medical device company.  Innocoll's common stock is traded on the NASDAQ under the ticker symbol "INNL."

10.     Defendant Anthony P. Zook ("Zook") has been President, Chief Executive Officer ("CEO") and a director of the Company and its predecessor, Innocoll AG, since December 2014.

11.     Defendant Jonathan Symonds ("Symonds") has been Chairman of the Board since May 2014.

12.     Defendant Shumeet Banerji ("Banerji") is Vice Chairman of the Board and has been a director of the Company and its predecessors since May 2014.

13.     Defendant David R. Brennan ("Brennan") has been a director of the Company and its predecessors since May 2014.

14.     Defendant A. James Culverwell ("Culverwell") has been a director of the Company and its predecessors since August 2013.

15.     Defendant Rolf D. Schmidt ("Schmidt") has been a director of the Company and its predecessors since August 2013.

16.     Defendant Joseph Wiley ("Wiley") has been a director of the Company and its predecessor since December 2014.

17.     Defendants Zook, Symonds, Banerji, Brennan, Culverwell, Schmidt and Wiley are collectively referred to herein as the "Board" or the "Individual Defendants."

### OTHER RELEVANT ENTITIES

18.     Gurnet Point L.P. is a Delaware limited partnership.

19.     Waypoint International GP LLC is the general partner of Gurnet Point L.P.

20.     Gurnet Bidco is an Irish private limited company and wholly-owned subsidiary of Gurnet Point.

## CLASS ACTION ALLEGATIONS

21.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Innocoll common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.      Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

23.      The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of April 20, 2017, there were 30,095,931 ordinary shares of the Company issued and outstanding. All members of the Class may be identified from records maintained by Innocoll or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

24.      Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)      Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

25.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Company Background

28.     Innocoll is a global, commercial stage specialty pharmaceutical and medical device company with late stage development programs targeting areas of significant unmet medical need. The Company utilizes its proprietary collagen-based technology platform to develop biodegradable and fully bioresorbable products and product candidates which can be applied topically or broken down by the body without need for surgical removal.  Using Innocoll's own processes at its manufacturing facility, the Company derives and purifies bovine and equine collagen, then incorporates the purified collagen into the topical and implantable products. Innocoll's proprietary processes and technologies also enable it to control the texture, consistency, drug elution dynamics, resorption time and other physical characteristics of the finished product.

29.     The Company's lead product candidate is XARACOLL for the treatment of post-operative pain.  The Company initiated Phase 3 trials for XARACOLL in the third quarter of 2015. Innocoll received data from those Phase 3 efficacy trials in the second quarter of 2016, submitted a new drug application ("NDA") with the U.S. Food and Drug Administration ("FDA") in October

2016, and received a Refusal to File Letter from the FDA in December 2016. In February 2017, the Company attended a Type-A meeting with the FDA to review potential pathways forward, including a plan for proceeding with additional studies that would allow Innocoll to file a revised NDA for XARACOLL.

30.      In 2016, Innocoll generated $4.4 million of sales from its four marketed products: (i) CollaGUARD, which utilizes the Company's CollaFilm® technology, a transparent, bioresorbable collagen film for prevention of post-operative adhesions in multiple surgical applications, including digestive, colorectal, gynecological and urological surgeries; (ii) Collatamp® Gentamicin Surgical Implant ("CollatampG"), which utilizes the Company's CollaRx® sponge technology for the treatment or prevention of post-operative infection; (iii) Septocoll®, a bioresorbable, dual-action collagen sponge, for the treatment or prevention of post-operative infection, which Innocoll manufactures and supplies to Biomet Orthopedics Switzerland GmbH; and (iv) RegenePro, a bioresorbable collagen sponge for dental applications which the Company manufactures and supplies to Biomet 3i.

31.      CollaGUARD has been approved in 12 countries in Asia, the Middle East and Latin America. In the second quarter of 2016, the Company commenced steps required for approval of CollaGUARD in the United States.

**The Sale Process**

32.      On March 3, 2016, defendant Zook and Pepe Carmona ("Carmona"), Chief Financial Officer of Innocoll, met with Gurnet Point representatives to discuss a possible equity or debt investment by Gurnet Point in the Company.

33.      In April 2016, Innocoll initiated a process to identify a European licensing partner for XARACOLL. In connection therewith, the Company retained Locust Walk Partners LLC

("Locust") as its financial advisor.  The Board modified the process in September 2016 to include potential U.S. partners.

34.     Between April 2016 and October 2016, Locust and Innocoll jointly contacted approximately 50 qualified prospects covering the European and/or U.S. markets.  Fifteen companies signed confidentiality agreements with Innocoll and engaged in multiple confidential briefings on XARACOLL.  The Proxy, however, fails to disclose whether these confidentiality agreements contain standstill provisions that are still in effect and operate to preclude any of these companies from submitting a topping bid for Innocoll.

35.     Locust approached several third parties with expertise in drug development to discuss a potential acquisition transaction, but none of these potential partners identified a strong interest in pursuing a transaction with Innocoll at that time.

36.     On June 16, 2016, the Company announced the pricing of a follow-on equity offering and sold 5,725,000 shares for $7.00 per ordinary share, with total proceeds of $37.6 million.

37.     Throughout June and July 2016, representatives of Innocoll and Gurnet Point met to discuss potential financing opportunities and plans for Innocoll.

38.     In July 2016, the Company engaged Deloitte Corporate Finance LLC ("Deloitte") to assess various potential strategic options and appropriate valuation multiples for Innocoll.

39.     On August 16, 2016, the Company engaged Piper as its lead financial advisor in connection with the Proposed Transaction.

40.     On September 21, 2016, Christopher Viehbacher ("Viehbacher"), Managing Partner of Gurnet Point, delivered to defendant Zook an initial offer to acquire the Company for $9.50 per share in cash.  The Board subsequently determined the proposal was inadequate.

41.     On November 21, 2016, after the Company publicly announced that its COGENZIA product was not successful in its two late stage clinical trials, the Board agreed to reopen discussions with Gurnet Point.  On December 5, 2016, Innocoll and Gurnet Point Capital LLC executed a confidentiality agreement.

42.     On December 29, 2016, the Company announced its receipt of the Refusal to File letter from the FDA.  The letter indicated that the NDA Innocoll submitted in October 2016 for XARACOLL was not sufficiently complete to allow for a substantive review of the application.

43.     Throughout December 2016 and January 2017, Gurnet Point conducted due diligence of the Company.  Defendant Symonds and Viehbacher discussed the Refusal to File letter as well as a structure for a potential deal that included an upfront cash payment and a CVR.

44.     On January 17, 2017, Viehbacher contacted defendant Symonds by telephone and outlined a revised offer to acquire Innocoll for an initial up-front cash payment of $2.00 per share and a CVR up to an additional $4.67 per share based on certain milestones with respect to XARACALL.  Viechbacher delivered a written offer to defendants Symonds and Zook on January 24, 2017, which stated the terms of the January 17 proposal and indicated that Gurnet Point would expect to be granted exclusivity and to receive reimbursement for its out-of-pocket expenses incurred in negotiating the Proposed Transaction.

45.     On February 7, 2017, Viehbacher delivered a revised offer letter to defendant Symonds which affirmed the financial terms of Gurnet Point's January 24 proposal with the addition of an amortized payment schedule with respect to certain XARACOLL milestones.

46.     On February 14, 2017, Viehbacher delivered a further revised offer which reiterated the financial terms of the February 7 offer, but added the potential for CVR payments upon achievement of certain net sales targets on an amortized achievement schedule.  The revised

proposal also included a draft non-solicitation and reimbursement agreement.

47.     On February 22, 2017, Gurnet Point submitted a further offer which reiterated the expectation that Gurnet Point would be granted exclusivity through March 7, 2017.  Also on February 22, 2017, the parties executed the non-solicitation agreement.  The Proxy fails to disclose the terms of the non-solicitation agreement, including when it expires.

48.     On March 8, 2017, Innocoll received a non-binding letter of intent ("LOI") from a third party interested in acquiring the Company.  The Proxy fails to disclose any details of this LOI and whether the third party is subject to a confidentiality agreement that contains a standstill provision still in effect.  Management explained to the Board that Innocoll was prohibited from engaging in further discussions with the third party at that time based on the non-solicitation agreement previously executed with Gurnet Point.  Although the Proxy states that "Innocoll's management intended to communicate to the third party that Innocoll was not able at this time to engage in conversations about a strategic transaction," the Proxy fails to disclose whether the Company did in fact communicate this to the third party.

49.     On March 30, 2017, Gurnet Point delivered a revised draft of the merger agreement and CVR agreement, which reflected a lower upfront cash consideration of $1.75 per share and an increase in the potential maximum CVR payments from $4.67 to $4.90 per share.

50.     On April 4, 2017, the Board held a meeting to discuss the Proposed Transaction. Piper delivered its fairness opinion and the Board approved the Merger Agreement.  The parties then finalized and executed the Merger Agreement and related documents.

**The Proposed Transaction**

51.     On April 4, 2017, following execution of the Merger Agreement, Innocoll and

Gurnet Point issued the Rule 2.5 Announcement and a joint press release announcing the Proposed

Transaction.  The press release stated, in relevant part:

> CAMBRIDGE, Mass. & ATHLONE, Ireland--Apr. 4, 2017-- Gurnet Point L.P., a
> healthcare investment fund, and Innocoll Holdings plc (NASDAQ:INNL), a global
> pharmaceutical and medical device company, today announced that they have
> reached an agreement on the terms of a recommended offer. Under the
> recommended offer, Gurnet Point will acquire Innocoll for $1.75 per share in cash,
> and up to $4.90 in cash from a contingent value right (CVR), for a total potential
> per share value of up to $6.65 or up to approximately $209 million in aggregate.
> The initial cash consideration of $1.75 represents a premium of approximately 120
> percent to the closing price per Innocoll Share on March 10, 2017, the last dealing
> day prior to the date on which the anomalous movement in Innocoll's shares
> commenced (and a premium of approximately 28 percent to the closing price per
> Innocoll Share on March 15, 2017, the day prior to Innocoll initiating the
> commencement of the offer period).
>
> During the offer period, Gurnet Point plans to provide a term loan of $10 million
> to give Innocoll additional resources needed for the continued development of
> XARACOLL within the post-operative pain market. Innocoll believes that the loan
> will provide it with the additional capital needed to prepare for the re-submission
> of the XARACOLL new drug application ("NDA") to the U.S. Federal Drug
> Administration ("FDA") in order to achieve the milestones related to the CVR.
>
> This transaction builds on Gurnet Point's strategy of investing in life science,
> medical technology and healthcare service companies. Since its initial NASDAQ
> public offering in 2014, Innocoll has leveraged its proprietary collagen-based
> technology to successfully complete two Phase 3 studies for XARACOLL,
> Innocoll's late-stage surgically implantable and bioresorbable collagen matrix.
> XARACOLL was developed to provide sustained post-operative pain relief
> through controlled delivery of bupivacaine at the surgical site.
>
> * * *
>
> The directors of Innocoll and major shareholders, including holdings managed by
> Fortress, Morgan Stanley, Sofinnova and Unique Technologies, have provided
> irrevocable undertakings to vote in favor of the scheme. In total, management,
> directors and shareholders have provided irrevocable undertakings representing
> 46% of the issued ordinary share capital of Innocoll. Details of these irrevocable
> undertakings, including the circumstances in which they cease to be binding, are
> set out in the announcement pursuant to Rule 2.5 of the Irish Takeover Rules made
> by Gurnet Point, Gurnet Bidco and Innocoll today.

"Gurnet Point intends to work with Innocoll's team to help bring XARACOLL to market by infusing substantial additional capital for its continued development and regulatory approval. We have great respect for Tony Zook and his team at Innocoll and look forward to investing in the business and assisting with the approval of XARACOLL and its commercialization," said Christopher Viehbacher, Managing Partner at Gurnet Point Capital.

Innocoll had expected to receive FDA approval of XARACOLL this year. On December 29, 2016, Innocoll announced that it had received a Refusal to File Letter from the FDA for XARACOLL. Among other points, the FDA indicated that XARACOLL should be characterized as a drug-device combination product and that additional clinical and nonclinical information on XARACOLL may be required. To provide this information, Innocoll proposes to conduct an additional short-term pharmacokinetic study and several short-term non-clinical toxicology and biocompatibility studies.

The Innocoll directors believe that, if adequately financed and successful, such studies may be completed in time for an end of year re-submission of the XARACOLL NDA. Data from these studies, along with additional manufacturing information required to address the new combination product designation by the FDA and other chemistry, manufacturing and control activities, are also expected to be included in the re-submission.

If the re-submitted NDA is accepted by the FDA, thereby allowing XARACOLL to ultimately be approved, the Innocoll directors believe that Innocoll could be in a position to commercialize XARACOLL by the end of 2018.

**Terms of the Transaction**

The transaction, which is valued at up to approximately $209 million (including the maximum amount payable upon achievement of the CVR milestones listed below), is expected to be implemented by means of a court-sanctioned scheme of arrangement under Irish law or, with the consent of the Irish Takeover Panel, a takeover offer if Gurnet Bidco so chooses. Innocoll's Board of Directors intends to recommend unanimously that Innocoll shareholders vote or procure votes in favor of the Transaction.

Under the terms of the acquisition, each CVR represents the right to receive a specified amount of cash payments, with each payment conditioned upon the achievement of certain events, called CVR Payment Events.

These CVR Payment Events are:

- First CVR Payment Event: Gurnet Bidco will pay $0.70 in cash per CVR if on or before December 31, 2018, XARACOLL is approved by the FDA with a label

covering indications for the treatment of postsurgical pain immediately following open abdominal Hernia repair.

- Second CVR Payment Event: Gurnet Bidco will pay an additional $1.33 in cash per CVR if, on or before December 31, 2018, XARACOLL is approved by the FDA with a label covering indications for the treatment of postsurgical pain immediately following Soft Tissue repair (and not limited to hernia repair).

- Third CVR Payment Event: If the milestone is met, Gurnet Bidco will either pay: $1.00 in cash per CVR if, on or before December 31, 2019, XARACOLL is approved by the FDA with a label covering indications for the treatment of postsurgical pain immediately following Hard Tissue repair; or, if not $0.60 in cash per CVR if, after December 31, 2019 but on or before June 30, 2020, XARACOLL is approved by the FDA with a label covering indications for the treatment of postsurgical pain immediately following Hard Tissue repair.

- Fourth CVR Payment Event: If the milestone is met, Gurnet Bidco will either pay: $1.87 in cash per CVR if global net sales of XARACOLL exceed $60 million in any four consecutive Calendar Quarters ending on or prior to December 31, 2019; or, if not, $1.00 in cash per CVR if global net sales of XARACOLL exceed $60 million in any four consecutive Calendar Quarters ending on or prior to March 31, 2020.

In the event that none of the CVR Payment Events occur by the relevant dates, then the CVR will have no value. The minimum payment of the CVR is zero and the maximum payment is $4.90 in cash per Innocoll Share.

## Insiders' Interests in the Proposed Transaction

52.     Gurnet Point and Innocoll insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Innocoll.

53.     Notably, it appears that Company management have secured positions for themselves following completion of the Proposed Transaction.  In the April 4, 2017 press release announcing the Proposed Transaction, Viehbacher stated "***Gurnet Point intends to work with Innocoll's team*** to help bring XARACOLL to market by infusing substantial additional capital for its continued development and regulatory approval. ***We have great respect for Tony Zook and his***

*team at Innocoll. . . .*" Emphasis added.

54.     Moreover, Company insiders stand to reap substantial financial benefits for securing the deal with Gurnet Point.  Pursuant to the Merger Agreement, upon consummation of the Proposed Transaction, Innocoll's directors and officers will receive cash payments for their Company superior options, restricted shares, and RSU awards.  The Proxy fails to disclose any details of the cash payments or any merger-related "golden parachute" compensation.

**The Proxy Contains Material Misstatements or Omissions**

55.     The defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to Innocoll's stockholders.  The Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision on the Proposed Transaction.

56.     As set forth below, the Proxy fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Innocoll management's projections; (ii) Innocoll insiders' potential conflicts of interest; (iii) the valuation analyses prepared by Piper in connection with the rendering of its fairness opinion; (iv) Piper's potential conflicts of interest; and (v) the sale process leading up to the Proposed Transaction. Accordingly, Innocoll stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

*Material Omissions Concerning Innocoll Management's Projections*

57.     The Proxy is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

58.     Although the CVR Consideration represents over 70% of the maximum amount of the Merger Consideration, the Proxy fails to provide Innocoll stockholders with critical information regarding the achievability of the respective milestones underlying the CVR Payment Events.

Specifically, the Proxy fails to provide any details regarding Innocoll management's or the Board's assessment of the probability and timing of FDA approval of XARACOLL with a label covering indications for the treatment of postsurgical pain immediately following: (1) open abdominal Hernia repair; (2) Soft Tissue repair (and not limited to Hernia repair); and (3) Hard Tissue repair – the bases of the First, Second and Third CVR Payment Events.   Critically, the Proxy states that one of the "Reasons for the Acquisition and Recommendation by the Innocoll Board" is "the belief of the Innocoll Board that at least a portion of the CVR Consideration is reasonably achievable, thereby potentially providing Innocoll Shareholders with an opportunity to realize value in addition to the Cash Consideration through further cash payments under the terms of the CVR Agreement" (emphasis added).   In other words, the Board only believes a portion of the CVR Consideration – which ranges in value from $0.70 per share to up to $4.90 per share – is reasonably achievable.   Yet, the Proxy provides stockholders no information as to what portion of the CVR Consideration is reasonably achievable. Without this critical information, Innocoll stockholders have no empirical basis upon which to value the CVR Consideration, leaving Innocoll stockholders in the dark as to the actual intrinsic value of the Company.

59.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     From pages 23-24 of the Proxy:

**Reasons for the Acquisition and Recommendation by the Innocoll Board**

\* \* \*

• the belief of the Innocoll Board that at least a portion of the CVR Consideration is reasonably achievable, thereby potentially providing Innocoll Shareholders with an opportunity to realize value in addition to the Cash Consideration through further cash payments under the terms of the CVR Agreement;

*Material Omissions Concerning Insiders' Potential Conflicts of Interest*

60.     The Proxy also fails to disclose material information concerning the potential conflicts of interest faced by Innocoll management.

61.     For example, the Company's Rule 2.5 Announcement which was filed with the SEC on April 4, 2017 states:

> *Following the Acquisition, Gurnet Point intends to support and assist Innocoll's management* in completing the necessary non-clinical and clinical studies required to pursue the approval of XARACOLL with the FDA, preparing and assembling the relevant regulatory information required for re-submission to the FDA of the XARACOLL NDA, undertaking the necessary manufacturing activities and preparing for an FDA pre-approval inspection of the new XARACOLL production site, and developing the strategic and marketing plan and associated infrastructure for XARACOLL's product launch.

Emphasis added.   Moreover, in the April 4, 2017 joint press release announcing the Proposed Transaction, Christopher Viehbacher, Managing Partner at Gurnet Point Capital stated:

> *Gurnet Point intends to work with Innocoll's team* to help bring XARACOLL to market by infusing substantial additional capital for its continued development and regulatory approval. *We have great respect for Tony Zook and his team at Innocoll* and look forward to investing in the business and assisting with the approval of XARACOLL and its commercialization.

Emphasis added.   Yet, the Proxy states: "[t]he Innocoll Board understands that, at this point in time, Gurnet Point has not yet developed its plans regarding the potential impact of the Acquisition on Innocoll's operations, including its employees."   Indeed, although it appears there is an understanding regarding Innocoll management's continuing employment, the Proxy completely fails to set forth any employment related discussions and negotiations that occurred between Gurnet Point and Innocoll's executive officers, including Innocoll's CEO Zook.   The Proxy further fails to disclose whether any of Gurnet Point's prior proposals or indications of interest mentioned management retention.

62.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.   This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that

information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

63.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     From page 26 of the Proxy:

The Innocoll Board understands that, at this point in time, Gurnet Point has not yet developed its plans regarding the potential impact of the Acquisition on Innocoll's operations, including its employees, locations of business or redeployment of fixed assets. The Innocoll Board understands that any such strategic plans will be finalized once the Acquisition has been completed and Gurnet Point has obtained a greater insight into the day-to-day running of the Innocoll Group, but welcomes the commitments given by Gurnet Point in the Transaction Agreement and as set out above.

***Material Omissions Concerning Piper's Potential Conflicts of Interest***

64.     In addition, the Proxy fails to disclose material information concerning the potential conflicts of interest faced by Piper in acting as the Company's financial advisor.

65.     The Proxy fails to disclose certain material information concerning the fee payable to Piper by Innocoll as a result of the Proposed Transaction.  The Proxy discloses that Piper "will receive an estimated fee of approximately $2.5 million from Innocoll, all of which, except for the [$750,000] opinion fee, is contingent upon and payable at the consummation of the Acquisition."  However, according to the Proxy, Piper "will receive an additional fee of $500,000 at the time the first payment associated with a CVR is paid to shareholders or would have been paid had the conditions for such payment been satisfied (and Piper Jaffray may receive additional fees in connection with the payment of the CVR Consideration in the event that the CVR Consideration becomes payable to Innocoll Shareholders)" (emphasis added).  The Proxy fails to disclose the specific circumstances under which the "additional fees" may be paid, as well as the estimated amount of the additional fees.

66.     In addition, the Proxy discloses the compensation paid to Piper by Innocoll over the

past two years as well as the nature of the services provided.  However, the Proxy fails to disclose whether Piper has provided any services to Gurnet Point or its affiliates in the past two years, and if so, the nature of those services and the amount of compensation it earned for those services.

67.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

68.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     From pages 51-52 of the Proxy:

Piper Jaffray acted as Innocoll's financial advisor in connection with the Acquisition and will receive an estimated fee of approximately $2.5 million from Innocoll, all of which, except for the opinion fee, is contingent upon and payable at the consummation of the Acquisition. The opinion fee paid to Piper Jaffray will be credited against the fee for financial advisory services described in the preceding sentence. Piper Jaffray received a fee of $750,000 for providing its Fairness Opinion to the Innocoll Board and will receive an additional fee of $500,000 at the time the first payment associated with a CVR is paid to shareholders or would have been paid had the conditions for such payment been satisfied (and Piper Jaffray may receive additional fees in connection with the payment of the CVR Consideration in the event that the CVR Consideration becomes payable to Innocoll Shareholders). The opinion fee was not contingent upon the consummation of the Acquisition or the conclusions reached in Piper Jaffray's opinion. Innocoll has agreed to indemnify Piper Jaffray against certain liabilities and reimburse Piper Jaffray for certain expenses in connection with its services. In the ordinary course of its business, Piper Jaffray and its affiliates may actively trade securities of Innocoll for its own account or the account of its customers and, accordingly, may at any time hold a long or short position in such securities. Piper Jaffray has, in the past, provided financial advisory and financing services to Innocoll and may continue to do so and has received, and may receive, fees for the rendering of such services. Specifically, Piper Jaffray served as lead left bookrunner on Innocoll's July 7, 2014 IPO, sole manager on its April 23, 2015 initial follow-on equity offering and as a bookrunner on its most recent June 16, 2016 follow-on equity offering, for which Piper Jaffray has received aggregate fees of approximately $4 million.

*Material Omissions Concerning the Sale Process*

69.     The Proxy also fails to disclose or misstates material information relating to the sale

process leading up to the Proposed Transaction.

70.    According to the Proxy, on March 8, 2017, Innocoll received a non-binding LOI from a third party interested in acquiring Innocoll.  The Proxy fails to disclose any details regarding the LOI.

71.    In addition, the Proxy fails to expressly indicate whether the confidentiality agreements entered into between Innocoll and 15 companies between April and October 2016 contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these companies from making a topping bid for Innocoll.  It is similarly unclear if the third party who submitted the March 8, 2017 LOI is one of the 15 companies that previously entered into a confidentiality agreement and whether this interested third party is now precluded from making a topping bid for Innocoll.  Such information is material to Innocoll stockholders as a reasonable Innocoll stockholder would find it material and important to their voting decision whether or not parties that had previously been interested in a potential acquisition of the Company are now foreclosed from submitting superior proposals.

72.    Furthermore, the Proxy fails to disclose any details regarding the non-solicitation agreement that Innocoll and Gurnet Point executed on February 22, 2017, including when Gurnet Point's exclusivity expired.  If exclusivity expired before the parties executed the Merger Agreement, then Innocoll could have engaged the interested third party who submitted the LOI.  A reasonable Innocoll stockholder would consider such information material as it indicates whether or not an interested party was purposely shut out from participating in the sale process.

73.    The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)    From page 99 of the Proxy:

On March 12, 2017, Messrs. Zook and Carmona provided an update to the Innocoll Board. Participating by telephone were representatives of Piper Jaffray, Dentons

and William Fry. The update focussed on the several work-streams related to the Gurnet Point discussions as well as with respect to a non-binding letter of intent (the "LOI") received on March 8, 2017 from a third party interested in acquiring Innocoll. During the meeting, Piper Jaffray explained that the implied third party offer and form of consideration appeared to be less attractive than the most recent proposal from Gurnet Point. Management explained to the Innocoll Board that based on the non-solicitation agreement previously executed with Gurnet Point, Innocoll was not, at that time (subject to applicable provisions of Irish law), permitted to engage in further conversations with this third party and that Innocoll's management intended to communicate to the third party that Innocoll was not able at this time to engage in conversations about a strategic transaction.

     (b)     From page 101 of the Proxy:

Between April and October 2016, Locust Walk Partners LLC and Innocoll jointly contacted approximately 50 qualified prospects covering the European and/or U.S. markets. 15 companies signed confidentiality agreements with Innocoll, engaged in multiple confidential briefings on XARACOLL and reviewed clinical data, summaries of regulatory interactions and commercial assessments that had been prepared by Innocoll. Of the companies contacted, one potential partner, an international pharmaceutical company with expertise in commercialization of pain treatments, submitted a non-binding offer for a European license transaction in December of 2016.

     (c)     From page 97 of the Proxy:

Later on February 22, 2017, Gurnet Point submitted a further, non-binding written offer to acquire all of the outstanding shares of Innocoll, which reiterated that the offer was subject to a satisfactory outcome of the Type A meeting with the FDA scheduled for February 23, 2017 and the expectation that Gurnet Point would be granted exclusive negotiation rights through March 7, 2017.

* * *

On February 22, 2017, the non-solicitation agreement was executed. . . .

### *Material Omissions Concerning Piper's Financial Analyses*

74.     The Proxy describes Piper's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Piper's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Innocoll's public stockholders are unable to fully understand these analyses and, thus,

are unable to determine what weight, if any, to place on Piper's fairness opinion in making their voting decision on the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Innocoll's stockholders.

75.     The Proxy fails to disclose various material elements of the financial analyses performed by Piper.  For example, Piper performed a *Discounted Cash Flow Analysis* that was presented to the Board, yet the Proxy fails to disclose (a) the value of Innocoll's net operating loss carryforwards ("NOLs") Piper utilized in the analysis; (b) the individual inputs and assumptions utilized by Piper to derive the discount rate range of 23.4% to 24.4%; and (c) the implied pricing multiples corresponding to the terminal growth rate range of 1.0% to 2.0%.

76.     Similarly, Piper performed a *Selected Public Companies Analysis* that was presented to the Board, yet the Proxy fails to disclose the individual multiples for each of the selected public companies analyzed by Piper, as well as the financial performance metrics for each selected company.  As Piper failed to select and apply multiples to Innocoll, the individual multiples are critical for Innocoll stockholders to assess Innocoll in relation to its peer companies.

77.     Finally, the Proxy fails to disclose whether Piper performed any valuation analysis related to the CVR Consideration and the details thereof.

78.     Without such undisclosed information, Innocoll stockholders cannot evaluate for themselves whether the financial analyses performed by Piper were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Piper's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

79.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     From pages 46-47 of the Proxy:

### Selected Public Companies Analysis

Piper Jaffray reviewed selected historical financial data of Innocoll and estimated financial data of Innocoll based on projections provided by Innocoll's management and compared them to corresponding financial data, where applicable, for listed public (1) pharmaceutical pre-marketed pain-focused companies at a similar stage of development whose value is derived primarily from a single development stage compound; and (2) biopharmaceutical companies that have received a refusal to file letter from the FDA, that Piper Jaffray deemed comparable, based on its experience and professional judgment, to Innocoll.

Based on these criteria, Piper Jaffray identified and analyzed the following selected companies:

*Pre-Marketed Pain-Focused Companies*
- Heron Therapeutics, Inc.
- Trevena, Inc.
- DURECT Corporation
- AcelRx Pharmaceuticals, Inc.

*Refusal to File Companies*
- Catalyst Pharmaceuticals, Inc.
- PTC Therapeutics, Inc.

Piper Jaffray calculated and compared financial multiples for the selected companies based on information it obtained from the Innocoll management team, public filings and other Wall Street research. With respect to each of the selected companies, Piper Jaffray calculated enterprise value as a multiple of Wall Street research analyst consensus estimated revenue for calendar year 2019 (based on the fact that 2019 revenue for Innocoll was projected by Innocoll management to represent the first full calendar year to include the results of the commercialization of XARACOLL).

The analysis indicated the following multiples:

*Pre-Marketed Pain-Focused Companies*

|  | Revenue Multiple CY2019E |
|---|---|
| Mean | 2.4x |
| Median | 1.9x |

*Refusal to File Companies*

|  | Revenue Multiple |
|---|---|
|  | CY2019E |
| Mean | 1.8x |
| Median | 1.8x |

Based on the foregoing, Piper Jaffray applied (i) a range of 2.4x to 1.9x, representing the mean and median, respectively, of estimated 2019 revenue multiples derived from the pre-marketed pain selected companies, to Innocoll's estimated calendar year 2019 revenue of $46 million, based on the projections set forth below, which resulted in an implied per share equity value range for the ordinary shares of approximately $2.90 to $3.68 and (ii) a multiple of 1.8x, representing both the mean and median of estimated 2019 revenue multiples derived from the refusal to file selected companies, to Innocoll's estimated calendar year 2019 revenue of $46 million, based on the projections set out in paragraph 12 (Certain Financial Projections) of this Part 3, which resulted in an implied per share equity for the ordinary shares of approximately $2.83. Piper Jaffray compared these implied per share values to the Cash Consideration of $1.75 per ordinary share and total potential CVR Consideration of up to $4.90 per ordinary share, without interest, to be paid to the holders of ordinary shares (other than ordinary shares held in treasury or owned by Gurnet Point or Gurnet Bidco) pursuant to the Transaction Agreement.

(b)     From page 49 of the Proxy:

### Discounted Cash Flow Analysis

Using a discounted cash flow analysis, Piper Jaffray calculated an estimated range of theoretical values for Innocoll using the projections provided by Innocoll's management and summarized in the section below, based on the net present value of (i) free cash flow from December 31, 2017 to December 31, 2027, (ii) a terminal value at December 31, 2027 based on a perpetuity growth rate range of 1.0% to 2.0% applied to free cash flow for 2027 discounted back to March 31, 2017 and (iii) Innocoll's net operating loss carryforwards (" NOLs ") discounted back to March 31, 2017 based on management's projections for the periods for which Innocoll could use the NOLs and tax credits for earnings taxed by the applicable jurisdiction. The unlevered free cash flow for each year was calculated from Innocoll's projections as operating income, less taxes, plus depreciation and amortization, plus stock-based compensation, less capital expenditures, plus/less change in net working capital. Using such projections, Piper Jaffray calculated working capital as current assets less current liabilities in accordance with the model provided by Innocoll's management. Using the projections provided by Innocoll's management, Piper Jaffray calculated the range of net present values based on a range of terminal growth rates from 1.0% to 2.0% and using a range of discount rates from 23.4% to 24.4%, (calculated based on Innocoll's weighted average cost of capital). Based on management's direction, $171 million in future

financing is required to achieve the management projections, and as a result, the $171 million was subtracted from the combined present value and terminal value of free cash flow. This analysis resulted in implied per share values of Innocoll's ordinary shares ranging from a low of $0.87 per Innocoll share to a high of $1.74 per ordinary share. Piper Jaffray observed that the up-front Cash Consideration of $1.75 per ordinary share was above the upper limit of the range derived from this analysis and the Consideration was significantly above the range derived from this analysis.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

80.     Plaintiff repeats all previous allegations as if set forth in full.

81.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

82.     During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

83.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the defendants. The Proxy misrepresented and/or omitted

material facts, including material information about the unfair sale process for the Company, the financial analyses performed by the Company's financial advisors, and the actual intrinsic standalone value of the Company. The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

84.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

85.    By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

86.    Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

**COUNT II**

**Class Claims Against the Individual Defendants for
Violation of Section 20(a) of the Exchange Act**

87.    Plaintiff repeats all previous allegations as if set forth in full.

88.    The Individual Defendants acted as controlling persons of Innocoll within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of Innocoll and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

Plaintiff contends are false and misleading.

89.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

91.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

92.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

93.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Innocoll, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Innocoll stockholders;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: May 5, 2017

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Tel: (610) 667-6200
Fax: (610) 667-9029
E-mail: esmith@brodskysmith.com
E-mail: mackerman@brodskysmith.com

**OF COUNSEL:**                    *Attorneys for Plaintiff*

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*